INFORMATION COPY
NOT YET ISSUED
DIS. CT. # 02-00027

## NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

05 FEB -1 AM 11: 46

No. 03-3103

**FILED**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JAN 3 1 2005

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| ROBERT L. BECK, ET AL., | ) | 1, 02cv 27 |
| | ) | |
| **Plaintiffs-Appellants,** | ) | |
| | ) | |
| v. | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| GANNETT SATELLITE | ) | COURT FOR THE SOUTHERN |
| INFORMATIONAL NETWORK, | ) | DISTRICT OF OHIO |
| INC., d/b/a | ) | |
| The Cincinnati Enquirer | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellee.** | ) | |
| | ) | |

**Before: BATCHELDER and MOORE, Circuit Judges, and CALDWELL,** [*] **District Judge.**

**KAREN K. CALDWELL, District Judge.**  Plaintiff-Employees appeal the order of the district court granting summary judgment in favor of Defendant Gannett Satellite Information Network, Inc., d/b/a The Cincinnati Enquirer (hereinafter "the Enquirer"); denying Plaintiff-Employees' motions for a temporary restraining order and preliminary injunction; and dismissing Plaintiff-Employees' claims without prejudice. Plaintiffs, long-time composing room employees of the Enquirer, filed suit claiming anticipatory breach of contract and seeking injunctive relief in order to prevent the Enquirer from taking certain actions that Plaintiff-Employees believe jeopardize the

---

[*]The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

lifetime employment guaranteed to them by a 1972 "Letter of Understanding." In its order granting summary judgment and denying injunctive relief, the district court found that Plaintiff-Employees' state law claims were preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. §185. The court then found that Plaintiff-Employees' claims should be dismissed because (1) Plaintiff-Employees failed to utilize the grievance procedures provided by an "implied-in-fact CBA" before filing the lawsuit; (2) the Norris-LaGuardia Act, 29 U.S.C. § 101, prohibited the Court from granting the relief requested; and/or (3) Plaintiff-Employees' claims were not ripe for adjudication. (Dist. Ct. SJ Order, J.A. at 26-42). Plaintiff-Employees claim on appeal that the district court erred in all of the findings stated above. For the reasons stated below, we **AFFIRM** the district court's ruling.

## I. FACTS AND PROCEDURE

The Plaintiff-Employees in this case are fourteen Enquirer composing room employees,[1] whose years of service with the newspaper range from thirty to fifty-five years. The Cincinnati Typographical Union No. 3 ("the Union") is Plaintiff-Employees' recognized collective bargaining unit.

In 1972, as technological advances threatened to eliminate manual typesetting positions, the Union and the Enquirer entered into a Letter of Understanding (or "LOU") regarding job security for composing room employees. The Letter of Understanding provided as follows:

---

[1]Plaintiff-Employees are Robert L. Beck, Jack W. Brewer, Donald R. Gentry, Ed Haddox, Paul Anton Hansen, Kenneth M. Jones, William L. McCarthy, William Hershel Potter, Richard Redmon, Gary L. Smith, Donald Stringer, Edward Strohmeier, Al Thoma, and Stan Webster.

LETTER OF UNDERSTANDING
BETWEEN
CINCINNATI TYPOGRAPHICAL UNION NO. 3
AND
THE CINCINNATI ENQUIRER

Job Security

The Cincinnati Enquirer is continuing to introduce mechanical/electronic composition systems into the Composing Room and proposes to continue appropriate programs for training of Composing Room employees assigned to work with such systems. In response, the Union has proposed provisions for job security and retirement, or the continuance of benefits and has expressed its members' willingness to continue to assist in and expedite the transition into such system.

Accordingly, it is understood that the following provisions shall apply as between the parties and their successors.

The Enquirer agrees that all regular situation holders as listed in the Enquirer's priority list dated November 28, 1972[,] on the attached Exhibit A will be continuously employed by The Enquirer, subject to voluntary termination, voluntary retirements, and involuntary terminations for just cause, as provided in Section 20 of the Contract. In case a strike, lock-out, "Act of God", results in a period of temporary suspension of the employer's Composing Room operations, the job security will be suspended for such period of temporary suspension of operation only.

Retraining

The Enquirer will provide opportunity for training on Composing Room equipment within the systems and the Foreman shall select employees for such training from the priority list in priority order with due regard to aptitude and ability, and suitable tests may be given to assist him in making such selections.

Enquirer Mechanical Electronic
Composition Systems
Standing Committee

It is agreed that the present negotiating committee, consisting of Union and Employer representatives [. . .] shall be maintained and continued in operation as an Enquirer Mechanical Electronic Composition Systems Standing Committee, for the purpose of meeting at the convenience of the members of the Committee, to further discuss when necessary, [sic] the

provisions of this letter and to further interpret the provisions contained herein.

(J.A. at 21). The parties in the current case agree that, unless one of the enumerated exceptions for termination applies, the Letter of Understanding gave Plaintiff-Employees a guarantee of lifetime employment.

The Letter of Understanding was appended to and made a part of the parties' most recent collective bargaining agreement ("1981 CBA"), which covered a three-year period ending February 29, 1984, though the 1981 CBA did not specifically mention the LOU. (1981 CBA, J.A. at 172-187). After the 1981 CBA expired, the Enquirer and the Union attempted to negotiate a new CBA, but ultimately reached an impasse in 1987. Therefore, on October 12, 1987, the Enquirer unilaterally posted terms and conditions of employment in the composing room. Both the Regional Director and the General Counsel of the National Labor Relations Board found that the Enquirer's unilateral posting of the new conditions of employment (hereinafter the "Posted Conditions") was legal. See *Cincinnati Typographical Union No. 3 v. Gannett Satellite Information Network, Inc.*, 849 F.Supp. 590, 592 (S.D. Ohio 1992) (noting that fact), *aff'd* 17 F.3d 906, 908 (6th Cir. 1994) (noting same fact). The newly posted terms and conditions then governed Plaintiff-Employees' employment. See *Cincinnati Typographical Union No. 3*, 17 F.3d at 909. Attached to the Posted Conditions was the 1972 Letter of Understanding guaranteeing Plaintiff-Employees lifetime employment. Plaintiff-Employees in this case claim that the LOU was attached without explanation, but the district court found that the LOU was "included" in the Posted Conditions.

The Posted Conditions incorporated much of the expired CBA.   For example, both the 1981 CBA and the Posted Conditions defined the type of work "traditionally performed" by composing room employees.[2]  (Posted Conditions § 2(b), J.A. at 57-58; 1981 CBA § 2, J.A. at 174-5).   Both noted that the Enquirer had the right to assign composing room employees to other departments in order to perform such work, but recognized that "work is to continue to be performed by the Composing Room unit subject to the rights of the [Enquirer] to assign and reassign work as stated herein." (Posted Conditions § 2(b), J.A. at 58; 1981 CBA § 2, J.A. at 175).

---

[2]The full provision from the Posted Conditions reads as follows:

The jurisdiction of the Union is defined as all work assigned to the Composing Room of the Publisher.  The Publisher shall have the right to assign any of the work required by such new, or existing technology, equipment or processes to any department of the Publisher, including departments not covered by this Agreement.  The Union agrees to process copy or material produced in such other department.  The Publisher shall have the sole right to determine what constitutes new or existing technology, equipment or processes.  The Publisher will assign to the employees on Exhibit A, work of the type traditionally performed in the Composing Room such as pasteup, markup, keyboarding, makeup, computer operation, ad composition, machinist or variations of those functions as the functions change due to new technology, but this does not mean that all or any portion of any one function must be exclusively performed in the Composing Room. Although the jurisdiction of this Agreement is not exclusive, employees from other departments will be assigned to perform work of the Composing Room in the Composing Room for production of the product.  Employees covered by this Agreement may be assigned to work in departments other than the Composing Room to perform all work specified herein, provided they remain covered by this agreement.  This understanding shall continue to apply under a pagination system.

It is mutually agreed that the jurisdiction and production flexibility provided herein does not conflict with the basic concept recognized by the parties in this Agreement of a Composing Room bargaining unit and that work is to continue to be performed by the Composing Room unit subject to the rights of the Publisher to assign and reassign work as stated herein.

(Posted Conditions § 2(b), J.A. at 57-58; 1981 CBA § 2, J.A. at 174-5).

The Posted Conditions also provided for the creation of a Joint Standing Board, comprised of two Union representatives and two employer representatives, to resolve complaints arising out of performance of the Posted Conditions. The Posted Conditions provided that all questions regarding discharge, construction of the Posted Conditions, and alleged violations of the Posted Conditions be referred to the Joint Standing Board and that the decisions of that board were final. (Posted Conditions § 5, J.A. at 59-61). The Posted Conditions provided for arbitration following a decision by the Joint Standing Board only in the case of discharge.

The Enquirer stated to the district court below that every dispute that has arisen since 1987 has been submitted to arbitration. (Donohue 8/26/02 Aff. ¶ 3, J.A. at 305-06). However, we note that the Enquirer and the Union previously asked this Court to interpret the provisions of the Posted Conditions when the Enquirer refused to submit grievances over certain types of layoffs to arbitration. *See Cincinnati Typographical Union No. 3*, 17 F.3d at 907. Nevertheless, our opinion in that prior case noted the use of the Joint Standing Board for other types of grievances. 17 F.3d at 908 (stating in facts that grievances over layoffs had been taken to the Joint Standing Board).

The present dispute arose from the Enquirer's November 2001 announcement of its plans to install an automated pagination system ("New Pagination System"). Plaintiff-Employees believed that implementation of the New Pagination System would "obviate the need for their jobs and continued employment at the Enquirer." (Plaintiff-Employees' Complaint ¶ 7, J.A. at 18). Plaintiff-Employees further "believe[d] that once the pagination system is installed, they [would] be terminated or transferred to another job in breach of the Enquirer's continuous employment guarantee as composing room

employees."[3]  (*Id.* at ¶ 9, J.A. at 18).  In conjunction with the installation of the New

Pagination System, the Enquirer offered composing room employees a $50,000 buy-out

of their lifetime employment guarantee, which Plaintiff-Employees refused.

On January 11, 2002, Plaintiff-Employees filed a three count complaint against

the Enquirer in the Hamilton County Court of Common Pleas.  Plaintiff-Employees' first

cause of action alleged that the planned installation of the New Pagination System is an

anticipatory breach of the 1972 Letter of Understanding.  Plaintiff-Employees' second

cause of action sought a declaratory judgment that the Letter of Understanding prevents

the Enquirer from terminating or transferring Plaintiff-Employees from the composing

room even after the installation of the New Pagination System.  Finally, Plaintiff-

Employees' third cause of action sought an injunction prohibiting the Enquirer from

violating the terms of the Letter of Understanding.  (Complaint, J.A. at 15-25.)

At the same time, Plaintiff-Employees moved for a temporary restraining order

and preliminary injunction to (1) maintain the current status quo regarding Plaintiff-

Employees' employment situation at the Enquirer; (2) prevent the Enquirer from

breaching the terms of the LOU regarding the Plaintiff-Employees' continued

employment; and (3) prohibit the Enquirer from implementing the New Pagination

System until the issues associated with Plaintiff-Employees' employment are

satisfactorily resolved.  (Plaintiff-Employees' TRO Mtn., J.A. at 46).

---

[3]Plaintiff-Employees' fears were based in part on (1) conversations certain employees had with the composing room supervisor, who speculated that if the Plaintiff-Employees did not take a buy-out offer from the Enquirer, they would probably end up in the mailroom (Depo. Test., J.A. at 816, 826-27; 528); and (2) statements in the Enquirer's internal budget documents discussing the cost savings of closing the composing room (J.A. at 362-364).

On January 14, 2002, the Enquirer removed the case from state court pursuant to 28 U.S.C. §§ 1441 & 1446 on the grounds that Plaintiff-Employees' claims arose under the Labor Management Relations Act, 29 U.S.C. § 185.  (Notice of Removal, J.A. at 12-14).  On February 14, 2002, Plaintiff-Employees filed a reply in support of their motions for injunctive relief, in which they denied that their claims arose under federal labor law and instead contended that their claims arose strictly under state contract law.   (J.A. at 111-117).

On April 22, 2002, Plaintiff-Employees filed an additional motion for injunctive relief, seeking to stop the Enquirer from implementing the New Pagination System and transferring Plaintiff-Employees to other departments at the paper.  (J.A. at 121-129).

The Enquirer then moved for summary judgment on Plaintiff-Employees' claims, arguing that Plaintiff-Employees lacked standing to assert their claims and that the Norris-LaGuardia Act prevented the district court from granting the relief requested.  In any event, the Enquirer argued, Plaintiff-Employees failed to satisfy any of the traditional elements for granting injunctive relief.  The district court granted the Enquirer's summary judgment motion, denied Plaintiff-Employees' motions for injunctive relief, and dismissed Plaintiff-Employees' claims without prejudice on October 22, 2002. Plaintiff-Employees timely filed a notice of appeal on November 15, 2002.  (J.A. at 44).

Despite the purchase of the New Pagination System and the Plaintiff-Employees' refusal of the proposed buy-out, the Enquirer insists that it has every intention of honoring Plaintiff-Employees' lifetime employment guarantee.  Plaintiff-Employees argue, however, that the Enquirer intends to fulfill the lifetime employment guarantee by transferring Plaintiff-Employees to other departments, and that such transfers will

ultimately breach the lifetime employment guarantee, because the employees who cannot

perform adequately in a new position can be terminated for "just cause." Plaintiff-

Employees base this argument on a comment made by the Enquirer's counsel at a

scheduling conference before the district court that the Enquirer should not be put in the

position of keeping someone who cannot do a job. The counsel went on to say, however,

that the Enquirer did not anticipate assigning any Plaintiff-Employee to a job that would

be impossible for that Plaintiff-Employee to physically perform. (J.A. at 446-447.)

## II. ANALYSIS

### A.    Standard of Review

This Court has jurisdiction to review the district court's final judgment pursuant

to 28 U.S.C. § 1291. We review a district court's grant of summary judgment *de novo*.

*E.g., Sperle v. Michigan Dep't of Corrections*, 297 F.3d 483, 490 (6th Cir. 2002).

Summary judgment is proper only when there is no issue of material fact to be decided

and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In

reviewing the granting of such a motion, the Court must construe all evidence in the light

most favorable to the non-moving party and draw all reasonable factual inferences in that

party's favor. *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). The central issue is whether the evidence presents a sufficient disagreement to

warrant a trial or is so one-sided that one party must prevail as a matter of law. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    The Pre-emptive Effect of Section 301 of the LMRA on claims brought under the Letter of Understanding

-9-

Section 301 of the Labor Management Relations Act ("LMRA") grants the federal district courts jurisdiction of any suit "for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . without respect to the amount in controversy or without regard to the citizenship of the parties." Section 301(a), 29 U.S.C. § 185(a). Section 301 preempts all state law claims arising from the alleged breach of a collective bargaining agreement. *Smolanek v. Chrysler Corp.*, 879 F.3d 1326, 1329 (6th Cir. 1989) (*en banc*) (citing *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448 (1957); *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985)); *see also Welch v. General Motors Corp., Buick Motor Div.*, 922 F.2d 287, 290 (6th Cir. 1990) (citing *Smolanek*); *Mattis v. Mattman*, 355 F.3d 902, 905 (6th Cir. 2004) (citing *Smolanek*). If resolution of the state law claim depends upon the meaning of the collective bargaining agreement, then federal labor law preempts the state law claim. *Smolanek*, 879 F.2d at 1329 (citing *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988)); *Welch*, 922 F.2d at 291.

1.    *Whether the Posted Conditions are an "implied-in-fact CBA"*

In its order granting the Enquirer's motion for summary judgment, the district court found that, because the Enquirer had attached the LOU to the Posted Conditions, the LOU was part of an "implied-in-fact collective bargaining agreement" between the Union and the Enquirer. The district court reasoned that the implied-in-fact collective bargaining agreement arose when the Enquirer unilaterally imposed the Posted Conditions in 1987 and the Plaintiff-Employees and other composing room employees continued to work under them. In support of its conclusion, the district court cited

-10-

*McNealy v. Caterpillar, Inc.*, 139 F.3d 1113, 1122 (7th Cir. 1998).  In *McNealy*, the court

construed an employer's unilateral implementation of terms of employment following a

collective bargaining impasse as an offer, construed the labor union's cancellation of its

strike and return to work as an acceptance of that offer, and held that the offer and

acceptance constituted an implied-in-fact collective bargaining agreement.  *Id.* at 1123.

On appeal, Plaintiff-Employees argue that the Enquirer's unilateral

implementation of the Posted Conditions cannot be considered an offer.[4]  Plaintiff-

Employees also argue that even if unilateral implementation of the Posted Conditions

constitutes an offer made by the Enquirer, the fact that the composing room employees

continued to work should not be construed as an acceptance.  In support of this argument,

Plaintiff-Employees cite *United Paperworkers Int'l Union, AFL-CIO, Local 274 v.*

*Champion Int'l Corp.*, 81 F.3d 798, 803 (8th Cir. 1996) ("It mischaracterizes this regime

to say that, when the employer imposes unilateral terms and conditions after an impasse,

and the employees continue to work, a [section] 301 contract has been formed. . . .

[P]roof of an interim agreement requires not only evidence of the employer's intent to

make an offer, but also evidence of the union's intent to accept that offer over and above

---

[4]In support of their "no offer" argument, Plaintiff-Employees cite three cases cited
by the *McNealy* court for that proposition:  *International Union, United Mine Workers of*
*Am. v. Big Horn Coal Co.*, 916 F.2d 1499, 1501-02 (10th Cir. 1990); *Teamsters Local Union*
*No. 122 v. August A. Busch & Co. of Mass., Inc.*, 932 F. Supp. 374 (D. Mass 1996); *UAW,*
*Local 33 v. R.E. Dietz Co.*, 996 F.2d 592, 595 (2d Cir. 1993). *See McNealy*, 139 F.3d at
1121.  Contrary to the *McNealy* court's characterization, however, the Tenth Circuit's *Big*
*Horn* case did not focus on whether an employer's unilateral implementation of terms was
an offer, but instead focused on whether the union's conduct constituted an acceptance of
that offer.  916 F.2d at 1502.

the fact that union members continued to work."), and numerous cases on general contract law. (Appellant's Brief at 16-18).

The Enquirer's response to Plaintiff-Employees is that "[a]n employer may unilaterally change the terms and conditions of employment after impasse has occurred if the changes were reasonably comprehended in the terms of its contract offers to the union," and thus have the force of a contract. (Appellee's Brief at 10). In support of this argument, the Enquirer cites *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539 n.5 (1988); *American Ship Building Co. v NLRB*, 380 U.S. 300 (1965); *NLRB v. H&H Pretzel Co.*, 831 F.2d 650, 656 (6th Cir. 1987); and *Cincinnati Typographical Union No. 3*, 849 F.Supp. at 593. None of these cases, however, focuses on the existence of a section 301 labor contract. The first three cases concern whether an employer's unilateral implementation of terms is an unfair labor practice in violation of section 8 of the National Labor Relations Act – not whether that unilateral implementation creates a contract subject to federal jurisdiction under section 301 of the LMRA. In the last case, *Cincinnati Typographical Union No. 3*, the issue was not whether a section 301 contract existed, but whether the Enquirer was required to arbitrate grievances over certain composing room layoffs (an issue unrelated to the LOU).

Though this Circuit has not invoked the phrase "implied-in-fact CBA," we have long recognized that a section 301 labor contract may exist between an employer and a labor union in the absence of a formal, written collective bargaining agreement. "The principles controlling a determination of whether a Section 301 contract exists are well established." *International Brotherhood of Boilermakers, Iron Ship Builders,*

-12-

*Blacksmiths, Forgers & Helpers – Local 1603 v. Transue & Williams Corp.*, 879 F.2d

1388, 1392 (6ᵗʰ Cir. 1989). Noting that the Supreme Court has "broadly construed the

terms of Section 301, defining 'contract' to include any 'agreement between employers

and labor organizations significant to the maintenance of labor peace between them,'"

879 F.2d at 1392 (quoting *Retail Clerks Int'l Ass'n, Local Unions Nos. 128 & 633 v. Lion*

*Dry Goods, Inc.*, 369 U.S. 17, 28 (1962)), this Court has held that a "labor contract may

fall within the parameters of Section 301 even if the employer and the union have not

resolved disputes over substantive terms, including wage rates and work place

conditions." 879 F.2d at 1392 (citing *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1121

(6ᵗʰ Cir. 1981)). "Because federal labor policy has emphasized the important goal of

maintaining industrial peace, the technical rules of commercial contract law need not be

strictly applied to labor contracts." 879 F.2d at 1392 (citing *NLRB v. Truckdrivers,*

*Chauffers and Helpers, Local Union No. 100*, 532 F.2d 569, 571 (6ᵗʰ Cir. 1976)).

Of course, "a meeting of the minds . . . must occur before a labor contract is

created." *Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union*, 835

F.2d 1164, 1168 (6ᵗʰ Cir. 1987) (internal citations omitted). In cases similar to this one,

however, we have held that the existence of a labor contract "does not depend on its

reduction in writing; it can be shown by conduct manifesting an intention to abide by

agreed-upon terms." *Id.* (internal citations omitted); *Transue & Williams*, 879 F.2d at

1392 (citing *Bobbie Brooks*). Thus, in the *Bobbie Brooks* case, we found that the parties'

conduct following the execution of a "Memorandum of Understanding" during collective

bargaining negotiations, including the continuous process of grievances and deductions

of union dues, evidenced a section 301 contract between the employer and the union

-13-

concerning the subject of the Memorandum, even though the Memorandum was never reduced to a formal collective bargaining agreement. *See* 835 F.2d at 1168-1170.

In *Transue & Williams*, we similarly found that where the parties processed grievances according to the terms of a proposed contract that was never formally adopted as a CBA due to impasse over a separate term, and the employer paid wages according to the agreed-upon terms of that proposed contract, the conduct of both parties evidenced the creation of a labor contract subject to section 301. 879 F.2d at 1390, 1393.

Finally, in an unpublished opinion with facts very similar to the case at hand, a panel of this Court found that the conduct of the parties following an employer's *unilateral implementation* of terms and conditions of employment after collective bargaining negotiations with the union reached an impasse evidenced the formation of a contract subject to section 301. *Aircraft Braking Systems Corp. ("ABS") v. Local 856, International Union, United Auto, Aerospace and Agricultural Implement Workers*, 52 F.3d 324 (Table), 150 L.R.R.M. (BNA) 2575, 1995 WL 236678 (6th Cir. 1995) (unpublished in Federal Reporter). In the *ABS* case, the employer argued that it had no obligation to arbitrate a grievance under the unilaterally-implemented conditions it had posted because the union had never formally accepted or ratified those conditions. The Court found, however, that the following facts indicated that the union had accepted those conditions and thus a labor contract subject to section 301 existed: (1) the employees worked and did not strike; and (2) the union utilized the grievance procedures under the unilaterally-imposed terms and conditions. *See* 1995 WL 236678, **8-9. In reaching its decision, the court looked to Sixth Circuit precedent such as *Transue & Williams* and examined cases from other circuits, including the *Big Horn* case.

-14-

Based on the law of this Circuit, then, Plaintiff-Employees' contention that the composing room employees cannot accept the Posted Conditions and form a section 301 contract merely by continuing to work is correct.  However, the evidence before the district court showed that not only had the composing room employees continued to work after the Enquirer's implementation of the Posted Conditions, but they had utilized the grievance procedures contained in those Posted Conditions. *See Cincinnati Typographical Union No. 3*, 17 F.3d at 908 (noting in facts that a grievance over layoffs was taken to the Joint Standing Board following the implementation of the Posted Conditions).  Therefore, the district court was correct in finding that the Posted Conditions constitute a contract subject to section 301 jurisdiction.

 2. <u>*Whether federal labor law applies to the LOU regardless of its incorporation within the Posted Conditions*</u>

Plaintiff-Employees argue that even if the Posted Conditions are a section 301 contract, federal labor law still does not apply to the Letter of Understanding because (1) the LOU, though attached to the Posted Conditions, is not necessarily included in the Posted Conditions; and (2) the LOU is a contract of employment to which federal labor law does not apply.  We need not address the first argument, however, because the LOU, standing alone, is a labor contract to which section 301 applies.

The district court recognized that "even if the posted terms of employment are not considered an implied-in-fact CBA, . . . Plaintiffs' claims are preempted by [section] 301 because the Letter of Understanding is an agreement between the parties which is significant to the maintenance of labor peace between them," citing *Retail Clerks Int'l Ass'n, Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28 (1962).

-15-

(Dist. Ct. SJ Order, J.A. at 33). As previously explained above, section 301 provides

federal courts jurisdiction over any contract between an employer and a labor

organization, and this Circuit has followed the Supreme Court's construction of the term

"contract" as including "any agreement significant to the maintenance of labor peace

between [the union and the employer]." *Transue & Williams*, 879 F.2d at 1392 (internal

quotes omitted) (citing *Retail Clerks*, 369 U.S. at 28). Here, the LOU specifically states

that it is between the Union and the Enquirer. Moreover, it appears to have been

negotiated by the Union and the Enquirer in an effort to maintain labor peace as the

Enquirer sought to introduce new technology into its typesetting systems. *See also*

*Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1118 (6th Cir. 1981) (discussing how a

similar job security agreement between the Cincinnati Post and the same Union arose out

of collective bargaining negotiations the Union conducted with both the Enquirer and the

Post). The significance of the LOU's role in maintaining labor peace is also evidenced

by the fact that the LOU was attached to both the 1981 CBA and the 1987 Posted

Conditions. Based on this evidence, we find that the LOU is a labor contract subject to

federal jurisdiction under section 301 of the LMRA.

Plaintiff-Employees, however, contend that their claims under the LOU are based

solely in state contract law, and not federal labor law. They believe their position is

supported by the *Heheman v. E.W. Scripps Co.* case, which involved a similar agreement

(the "Scanner Agreement") between the Union and the composing room employees of

the Cincinnati Post (the "Post") extending a guarantee of lifetime employment to the

composing room employees. 661 F.2d at 1118-19. The dispute in *Heheman* arose when

the Post merged its composing room operations with the Enquirer's operations and then

-16-

fired all of the Post's composing room employees despite the Scanner Agreement's guarantee of lifetime employment. The employer argued that its obligation to extend lifetime employment to the employees ended when it shut down its printing operations because federal labor law did not compel it to maintain all or any part of its business. *See id.* at 1122. When the case reached this Court, we agreed that federal labor law did not compel the Post to maintain its business, but we rejected the argument that the Post's obligation to provide lifetime employment ended when the Post shut down its composing room. In so holding, we stated that "plaintiffs' claim does not rest on any alleged violation of labor law; it rests instead solely on the terms of the Scanner Agreement." *Id.* at 1122-23.

Plaintiff-Employees in this case interpret this statement in *Heheman* to mean that section 301 jurisdiction cannot apply to a suit over the LOU. However, Plaintiff-Employees overlook the fact that (1) the employees in *Heheman* sued the Post in federal court under the guise of section 301 jurisdiction, *id.* at 1119, and (2) the *Heheman* court described the Scanner Agreement as one of the "rare cases" in which a contract is *both* a labor agreement and a contract of employment. *Id.* at 1123 (citing *J.I. Case Co. v. NLRB,* 321 U.S. 332, 334-35 (1944)). The significance of the *Heheman* court's finding that the employees' claims arose from the breach of the Scanner Agreement related not to whether the federal courts had section 301 jurisdiction, but to whether the employees' claims could survive the expiration of a collective bargaining agreement or the cessation of operations. Therefore, Plaintiff-Employees' reliance on *Heheman* for the proposition that the LOU is not a section 301 contract is misplaced.

-17-

Plaintiff-Employees, however, also argue on appeal that after we decided *Heheman*, the Supreme Court ruled that section 301 does not preempt claims for the breach of an employment contract in *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987). In *Caterpillar*, however, the employment contracts under which employees brought their breach of contract claims were contracts negotiated between the employer and the individual employees while the individuals were not covered by a collective bargaining agreement. In other words, the contracts were not between an employer and the union. As noted by the Supreme Court in its opinion, "Section 301 says nothing about the content or validity of individual employment contracts." 482 U.S. at 394. Therefore, Plaintiff-Employees' reliance on the *Caterpillar* decision is also misplaced.

Accordingly, we find that section 301 of LMRA applies to Plaintiff-Employees' claims under the Letter of Understanding.

**C.      The District Court's decision to deny injunctive relief and dismiss Plaintiff-Employees' claims without prejudice.**

The district court found that it could not issue injunctive relief for three reasons: (1) Plaintiff-Employees failed to utilize the grievance procedures provided by the implied-in-fact CBA (i.e., the Posted Conditions) before filing this lawsuit; (2) the Norris-LaGuardia Act prohibited it from granting the relief requested; and (3) Plaintiff-Employees' claims were not ripe for adjudication.

1.      *Whether the labor contracts at issue provide any grievance procedures for claims of breach of the LOU*

After finding that the Posted Conditions were an implied-in-fact CBA, the district court found that the Plaintiff-Employees' claims under the Letter of Understanding were subject to the grievance procedures in the Posted Conditions because those Conditions

"incorporated" the LOU. The explicit terms of the Posted Conditions' grievance

provisions (J.A. at 59-61), however, do not clearly state whether those provisions apply

to claims arising under the LOU. Nevertheless, the LOU itself contains a procedure for

bringing grievances by providing for an "Enquirer Mechanical Electronic Compositions

Systems Standing Committee" to address "the provisions of this letter and to further

interpret the provisions contained herein." (J.A. at 21). The composition of this

committee is similar to that of the "Joint Standing Board" found in the 1981 CBA and the

1987 Posted Conditions; both consist of representatives of both management and the

Union. Moreover, the grievance provisions of the Posted Conditions (which are similar

to those in the 1981 CBA) appear to apply to any employee "discharge," which is the

primary potential harm cited by the Plaintiff-Employees.

Generally, where the labor agreement contains private dispute resolution

mechanisms, the district court does not have jurisdiction to address the dispute until such

mechanisms are exhausted. *See United Steelworkers of America v. American Mfg. Co.*,

363 U.S. 564, 568 (1960); *ARMCO Employees Independent Fed., Inc. v. ARMCO Steel

Co., L.P.*, 65 F.3d 492, 496 (6th Cir. 1995) ("[W]here a labor agreement mandates

arbitration, courts must order [a] resort to private settlement mechanisms without dealing

with the merits of the dispute.") (internal quotes omitted); 29 U.S.C. § 173(d) ("Final

adjustment by a method agreed upon by the parties is declared to be the desirable method

for settlement of grievance disputes arising over the application or interpretation of an

existing collective-bargaining agreement."). In this case, it is uncontroverted that

Plaintiff-Employees did not invoke any of the grievance resolution procedures provided

by the Posted Conditions or the LOU prior to filing this lawsuit. Therefore, we conclude

that the district court correctly denied injunctive relief on the basis of the language of the labor agreements between the Enquirer and the Union.

2.    _Whether the Norris-LaGuardia Act, 29 U.S.C. § 101, prevents the district court from issuing the injunctive relief requested by the Plaintiff-Employees._

The district court also found that the Norris-LaGuardia Act prevented it from issuing the injunctive relief requested by the Plaintiff-Employees. Section 101 of Title 29, U.S.C., provides, "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." The term "labor dispute" is defined in 29 U.S.C. § 113 as including "any controversy" between an employer and its employees "concerning terms and conditions of employment." 29 U.S.C. § 113(a)(1), (c). The Supreme Court has consistently interpreted the term "labor dispute" broadly. _See Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n_, 457 U.S. 702, 712-13 (1982) (holding that the term "labor dispute" must not be "narrowly construed").

Plaintiff-Employees' claims, which allege anticipatory breach of the LOU – a labor contract covered by section 301 – and which protest the transfer of the Plaintiff-Employees to other departments, are clearly a controversy "concerning terms and conditions of employment," and therefore a classic "labor dispute" under 29 U.S.C. § 113. Therefore, the Norris-LaGuardia Act prohibited the district court from enjoining the

Enquirer from taking the threatened actions alleged by Plaintiff-Employees.[5]  *See Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 409 (1976) ("[T]he Court has never indicated that the courts may enjoin actual or threatened contract violations despite the Norris-LaGuardia Act.").  We thus affirm the district court's ruling on this ground.

      3.    *Whether Plaintiff-Employees' claims were ripe for adjudication under traditional legal principles*

      The district court also found that Plaintiff-Employees lacked standing to assert claims under the "most fundamental jurisprudential considerations in that their claims are not ripe." (Dist. Ct. SJ Order, J.A. at 40).  As discussed in the district court's opinion, the ripeness doctrine is a component of Article III of the Constitution's standing requirement. The basic rationale of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (internal quotations omitted).

      In determining whether Plaintiff-Employees' claims are ripe, the court must take into consideration three factors: (1) the likelihood that the harm alleged by the Plaintiff-Employees will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims, and (3) the hardship to the parties if judicial relief is denied at this stage of the

---

    [5]On appeal, Plaintiff-Employees argue that "nothing in the [Norris-LaGuardia] Act prevents a federal court from granting an injunction to require an employer to maintain the status quo." In support of this argument, Plaintiff-Employees cite only one case, a 1961 case from another circuit: *Hilbert v. Pennsylvania R.R. Co.*, 290 F.2d 881, 884 (7th Cir. 1961). The *Hilbert* court made that statement, however, in the context of a case in which the court was trying to reconcile provisions of the Norris-LaGuardia Act with provisions of the Railway Labor Act.  It also made that statement without citing any other authority.  Given its context, *Hilbert* does not appear to be good authority for the present case.

proceedings. *Adult Video Ass'n v. United States Dept. of Justice*, 71 F.3d 563, 568 (6th Cir. 1995); *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002). If the Plaintiff-Employees' claims are not ripe for adjudication they should be dismissed. 71 F.3d at 568.

Under the first factor, the district court found "little likelihood" that the harm alleged by the Plaintiff-Employees will ever come to pass, concluding that the claims stated in Plaintiff-Employees' complaint were of a "speculative nature . . . based solely on their own beliefs and suspicions as to [the Enquirer's] likely course of action once the pagination system is installed." (J.A. at 40-41). The district court noted that the Enquirer represented that it intended to honor Plaintiff-Employees' guarantee of lifetime employment. Therefore, the district court found that the "doom" predicted by Plaintiff-Employees was not likely to occur.

On appeal, Plaintiff-Employees argue that the record before the district court contained the following information proving the likelihood that "Plaintiff-Employees' lifetime employment guarantee was about to be nullified" (Appellants' Brief at 26-27): (1) a budget proposal signaling the phase-out of all composing room activities; (2) a notice to composing room employees advising them of a new pagination system coupled with a buy-out offer; (3) the alleged statement by the composing room supervisor that employees who did not take the buy-out would be transferred to the mail room; (4) the alleged failure of the Enquirer to provide composing room employees with training on new composition systems as guaranteed by the LOL;[6] (5) allegations of six and one-half

---

[6]Though the Plaintiff-Employees have alleged that the Enquirer is breaching the training provisions of the LOU, the harm the Plaintiff-Employees seek to prevent is the loss

hours of unproductive time in a seven-hour shift; (6) the alleged farming-out of composing room work to other employees and departments; and (7) the Enquirer's alleged representation that any Plaintiff-Employee's inability to perform a new job to which he was transferred would be treated as "cause" for termination.[7]

These items cited by Plaintiff-Employees, however, only reinforce the fact that they are still guessing as to what the Enquirer will do regarding their future employment. Therefore, the Plaintiff-Employees have not come forward with sufficient evidence to establish the likelihood that the Enquirer plans to nullify its promise of lifetime employment.[8]

The district court found that the second factor, the development of the factual record, did not weigh particularly in either side's favor.

Finally, the district court correctly found that the third factor, the hardship that will result if judicial relief is not granted at this stage of the proceedings, weighed in the Enquirer's favor. As noted above, the LOU and the Posted Conditions appear to provide a grievance resolution procedure to which Plaintiff-Employees may resort.[9] Furthermore, given our previous holding in the *Heheman* case that the employment-contract nature of

---

of their jobs, not the lack of training on new composition systems.

[7]As noted above, however, this "representation" was a statement made by counsel for the Enquirer during a scheduling conference. (J.A. at 446-447).

[8]We note that, although the LOU discusses training composing room employees on new composition systems, the LOU's guarantee of lifetime employment does not, by its own terms, apply solely to employment in the composing room. It simply guarantees employment at the Enquirer.

[9]Such procedures may also be able to address the training issues raised by the Plaintiff-Employees.

-23-

the Union's similar Scanner Agreement with the Post survived the expiration of any other labor contract, Plaintiff-Employees may still bring legal action seeking full compensation for their injuries in the event the Enquirer does breach the Letter of Understanding. *See Heheman*, 661 F.2d at 1123, 1126. Therefore, the district court correctly found that no irreparable harm or substantial hardship would result absent judicial intervention. Accordingly, we affirm the district court's ruling that Plaintiff-Employees' claims are not ripe for adjudication.

### III. CONCLUSION

Because (1) the Letter of Understanding is a labor contract over which section 301 grants federal jurisdiction, preempting state-law claims; (2) the Norris-LaGuardia Act prevents the district court from issuing the injunctive relief sought by Plaintiff-Employees; and (3) Plaintiff-Employees' claims were not ripe for adjudication, we hereby **AFFIRM** the district court's rulings granting summary judgment to the Enquirer, denying Plaintiff-Employees' motions for injunctive relief, and dismissing Plaintiff-Employees' claims without prejudice.